UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

LEANNA JEAN COFFMAN,

    Plaintiff,

v.                                                  CIVIL ACTION NO. 5:22-cv-00396

NEXSTAR MEDIA, INC.
a Delaware Corporation,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

    Pending is Defendant Nexstar Media, Inc.'s ("Nexstar") Motion for Summary Judgment [ECF 26], filed August 7, 2023. Plaintiff Leanna Jean Coffman responded in opposition [ECF 28] on August 21, 2023, to which Nexstar replied [ECF 30] on August 28, 2023.[1]

**I.**

    From February 17, 2020, until August 19, 2022, Ms. Coffman was employed by Nexstar as an Account Executive at Nexstar's WVNS 59News station. [ECF 26-2]. In 2021, Ms. Coffman became pregnant with twins and eventually developed related complications. In late November or early December 2021, Ms. Coffman was diagnosed with placenta previa, which causes severe bleeding and was placed on bedrest. Given the bedrest restriction, Ms. Coffman requested to work remotely. Nexstar approved the request.

---

[1] Also pending is Ms. Coffman's Motion for Leave to Supplement Record [ECF 31], which requests that two pages of Al Sandubrae's deposition that were inadvertently omitted be added to the record. Nexstar offers no objection. The Court **GRANTS** the Motion.

In early January 2022, Ms. Coffman's condition worsened. She was life-flighted to Charleston Area Medical Center and hospitalized for the remainder of her pregnancy. Upon Nexstar's approval, Ms. Coffman continued to work remotely from her hospital bed until the birth of her twins. During this time period, Ms. Coffman testified her supervisor and Nexstar's local sales manager Dennie Large had informed her Nexstar was "trying to keep [her] off FMLA"[2] so she could continue working remotely and retain access to her accounts. [ECF 26-7, Coffman Depo. at 49:20-50:4]. Ms. Coffman conceded, however, she did not want to take FMLA leave at this time inasmuch as remote work permitted her to retain her eligibility for FMLA leave until after her twins were born. [*Id.* at 49:6-50:7]. In total, Ms. Coffman worked remotely for Nexstar for approximately eight weeks.[3]

On February 23, 2022, Ms. Coffman's twins were delivered via Cesarean section. She applied for and was given twelve weeks of FMLA leave beginning that day. Unbeknownst to her at that time, however, an attending physician cut her ureter. As a result, she developed numerous complications after the twins' birth, including infections, hospitalizations, and multiple surgeries. On March 4, 2022, Ms. Coffman underwent surgery to repair her ureter. A nephrostomy tube was inserted into her kidney. It was designed to drain urine into a nephrostomy bag on the outside of her body. The tube and bag caused Ms. Coffman significant pain and discomfort. They also restricted her ability to drive and stand for extended periods. Ms. Coffman was initially told she would have the tube for three months; that time frame was extended due to the extensive ureter damage. On

---

[2]"FMLA" refers to leave provided under the Family Medical Leave Act, 29 U.S.C. § 2601, et seq.

[3]It is undisputed Ms. Coffman and other Nexstar Account Executives also worked remotely during the COVID-19 pandemic.

March 10, 2022, Ms. Coffman was approved for short-term disability benefits after exhausting her paid leave. [ECF 26-12]. Ms. Coffman remained on FMLA leave during this time.

On April 3, 2023, Mr. Large inquired with Ms. Coffman via text message about her condition and asked "[h]ow much more time" she had with her twins. [ECF 26-14 at 2-3]. Ms. Coffman responded "[I] think six weeks[;] I don't know[;] the issue is I have to have another surgery." [*Id.* at 3]. Presumably, Ms. Coffman was indicating she had approximately six weeks left of FMLA leave but was expressing concern about having to undergo a second surgery that had been scheduled for June 2, 2022, to replace her nephrostomy tube. [ECF 26-15]. On May 17, 2022, Ms. Coffman exhausted her twelve weeks of FMLA leave. [ECF 28-2]. Although disputed by the parties, Ms. Coffman insists she spoke with Mr. Large in "mid to late April [or] May." [ECF 26-7, Coffman Depo. at 102:8-21]. She testified she asked about returning to work remotely, inasmuch as she "had worked from a hospital bed and from bedrest" prior to her twins' birth. [*Id.*] Ms. Coffman further testified Mr. Large promised to "run it up the flagpole." [*Id.*]. She contends Nexstar never responded. [ECF 28 at 2]. According to an April 18, 2022, "UNUM Disability and FMLA Medical Certification" one of Ms. Coffman's physicians predicted she could return to work on June 27, 2022, assuming the June 2, 2022, surgery produced no complications and her urologist cleared her return. [ECF 26-15]. Nexstar knew Ms. Coffman's tentative June 27, 2022, return to work date. [ECF 26-16 at 2].

On June 2, 2022, Ms. Coffman had surgery to replace the nephrostomy tube. On June 28, 2022, Nexstar's Human Resources Assistant Cyndi Patrick sent an email to Nexstar's Leave Coordinator, Jennifer Vansau, inquiring if she "had heard from UNUM in regards to if [Ms. Coffman] is coming off [short-term disability] and released to return to work or if she is unable to then we term?" [ECF 26-16 at 2]. Ms. Vansau replied UNUM had Ms. Coffman's return date as June 27, 2022, "however, per Nexstar's policy, we require the employee to provide us with a return

3

to work note." [*Id.*]. Ms. Vansau further explained the return to work note "must be on the doctor's letterhead with the doc[']s signature, and the date [Ms. Coffman] is cleared to return to work." [*Id.*]. Ms. Vansau instructed Ms. Patrick to contact Ms. Coffman and, if contact was unsuccessful, "to reach out to [her] [human resources] contact for further assistance." [*Id.*].

At some later, unspecified time, Ms. Patrick called Ms. Coffman. [*Id.* at 3]. She explained her short-term disability had ended June 27, 2022; Ms. Coffman replied, "they're extending it [because] I still have the tube," and she informed Ms. Patrick she was unable to return to work. [*Id.*]. Ms. Coffman added her short-term disability would be extended through "August 20 something." [*Id.*]. Ms. Patrick agreed Ms. Coffman was indeed still eligible for short-term disability; she added, however, the FMLA leave expired at the end of twelve weeks, with "four extra weeks of leave" added thereto by Nexstar. [*Id.*]. According to Ms. Patrick, Ms. Coffman then "interrupted and said [']well do you want to talk to my lawyer,[']" to which Ms. Patrick replied "no," she "had nothing to do with that" and advised Ms. Coffman to "contact Corporate and let them know." [*Id.*]. The conversation then ended. [*Id.*]. Shortly thereafter, Ms. Patrick received a follow-up text message from Ms. Coffman stating:

> Please do not contact me regarding a return to work date when I have been unable to return and still have shortterm [*sic*] disability plus bonding leave[.] My attorney is Jason Harwood and he can be reached at [redacted].

[*Id.*].

On July 28, 2022, Ms. Coffman received a letter from Nexstar's Associate Counsel and Senior Vice President of Human Resources Terri Lynn Bush. Ms. Bush informed Ms. Coffman her leave commenced February 23, 2022, her twelve weeks of FMLA leave expired May 17, 2022, and Nexstar provided her with additional leave given her inability to return to work. [ECF 28-2]. The letter further directed Ms. Coffman to inform Nexstar by August 4, 2022, of her expected return date. [*Id.*].

4

On August 4, 2022, Ms. Coffman responded via email to Ms. Bush's letter. [ECF 28-4]. She informed her that she "was still under intense care" and had surgery on August 8, 2022, to remove the nephrostomy tube. [*Id.*] She mentioned a recovery time of four to eight weeks. [*Id.*] She also stated from August 8 through October, she would "have a urethral catheter," which would prevent her from lifting and driving "(due to safety concerns of the tubing being entangled and pulled which could result in additional damages)." The October endpoint was contingent upon a tentative surgery to determine whether "the ureter reimplantation was successful and [if] [her] body ha[d] healed well enough for the stint to be removed." [*Id.*]. Ms. Coffman further stated that was all the information she knew at that time. [*Id.*].

On August 15, 2022, Ms. Bush terminated her employment with Nexstar, effective August 19, 2022. [ECF 28-3]. Ms. Bush explained Ms. Coffman had "been off work since February 23, 2022[,]" and "[Nexstar] [could] no longer hold [her Account Executive job . . . .]" [*Id.*]. She was, however, "welcome to apply for open positions in the future." [*Id.*]. On August 24, 2022, Ms. Coffman's short-term disability ended. [ECF 28 at 4]. On September 19, 2022, Ms. Coffman's physician cleared her to return to work that day. [ECF 28-5]. Nexstar knew nothing of this given the termination.

On September 15, 2022, Ms. Coffman instituted this action alleging Nexstar's termination decision gave rise to the following claims: (1) disability discrimination in violation of the West Virginia Human Rights Act ("WVHRA"), W. Va. Code § 5-11-1 et seq., (2) retaliatory discharge in violation of the Family Medical Leave Act ("FMLA"), (3) retaliatory discharge in violation of the WVHRA, and (4) failure to provide a reasonable accommodation in violation of the WVHRA.

On August 7, 2023, Nexstar moved for summary judgment on each of Ms. Coffman's claims. [ECF 26]. Nexstar generally contends Ms. Coffman has not met its asserted legitimate

5

business reason for her termination. [ECF 27 at 10]. Nexstar notes her lack of proof that (1) she was able to work at the time she was terminated; (2) "Nexstar's actions were not required to avoid a budget shortfall;" and (3) Nexstar harbored a discriminatory or retaliatory animus towards her. [*Id.* at 2].

Ms. Coffman responds Nexstar denied her multiple "reasonable accommodations" to wit: (1) permitting her to work remotely; (2) granting her unpaid time for recovery; or (3) permitting her to take paid parental leave, consistent with Nexstar's policy, beginning August 24, 2022, the date her short-term disability expired. [ECF 28 at 10]. She also claims Nexstar's asserted legitimate business reasons for her termination were pretextual. [*See id.* at 14-17].

## II.

### A.  Governing Standard

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)).

The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the*

*Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

B.  *WVHRA: Disability Discrimination and Reasonable Accommodation Claims*

The WVHRA provides pertinently as follows respecting discrimination based upon disability:

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, . . . [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is . . . disabled.

W. Va. Code § 5-11-9(1). The WVHRA thus "protects a disabled individual's right to employment so long as that individual is capable, with reasonable accommodation, of completing the bona fide, essential functions of the job." *Woods v. Jefferson Corporation*, 241 W. Va. 312, 319, 824 S.E.2d 539, 545 (2019). The governing regulations provide "[n]o employer shall, on the basis of disability, subject any qualified individual with a disability to discrimination in employment as it relates to . . . termination." W. Va. Code R. §§ 77-1-4.1.1, 77-1-4.1.2. The regulations further define "qualified individual with a disability" as follows:

> 4.2. "Qualified Individual with a Disability" means an individual who is able and competent, with reasonable accommodation, to perform the essential functions of the job, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description may be considered evidence of the essential functions of the job. A job function may be considered essential for several reasons, including but not limited to the following:
>
> 4.2.1. The function may be essential because the reason the employment position exists is to perform that function;
>
> 4.2.2. The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

7

> 4.2.3. The function may be essential because of the amount of time spent on the job performing the function.

W. Va. Code R. § 77-1-4.2. "[A] 'qualified individual with a disability' under the [WVHRA] and the accompanying regulations is one who is able and competent, with reasonable accommodation, to perform the essential functions of the job in question." *Woods*, 214 W. Va. at 319, 824 S.E.2d at 546 (cleaned up) (internal citations omitted). "'Able and competent' means that, with or without reasonable accommodation, an individual is currently capable of performing the work and can do the work without posing a direct threat . . . of injury to health and safety of either other employees or the public." W. Va. Code R. § 77-1-4.3.

"'Reasonable [a]ccommodation' means reasonable modifications or adjustments to be determined on a case-by-case basis which are designed as attempts to enable an individual with a disability to be hired or to remain in the position for which [s]he was hired." W. Va. Code R. § 77-1-4.4. A reasonable accommodation further "requires that an employer make reasonable modifications or adjustments designed as attempts to enable an individual with a disability to remain in the position for which she . . . was hired." *Id.* The WVHRA "requires that the process of determining what constitutes reasonable accommodation in a particular case be flexible in order to balance the interests of the employee in continued employment and the interests of the employer in avoiding unreasonable burdens or expenses." *Haynes v. Rhone-Poulenc, Inc.*, 206 W. Va. 18, 31, 521 S.E.2d 331, 344 (1999). "Plaintiff bears the burden of persuasion with respect to demonstrating that an accommodation is reasonable." *Kitchen v. Summer Continuous Care Center, LLC*, 552 F. Supp. 2d 589, 596 (S.D.W. Va. 2008).

The Supreme Court of Appeals of West Virginia has incorporated the "qualified individual with a disability" requirement into the following elements of a discriminatory discharge claim based on disability: "(1) he or she meets the definition of [having a 'disability'], (2) he or she

8

is a '[qualified individual with a disability],' and (3) he or she was discharged from his or her job." *Woods*, 214 W. Va. at 320, 824 S.E.2d at 547 (quoting Syl. Pt. 2 *Morris Mem'l Convalescent Nursing Home, Inc. v. W.Va. Human Rights Comm'n*, 189 W. Va. 314, 431 S.E.2d. 353 (1993)). To have a "disability" under the WVHRA, a plaintiff must have a "mental or physical impairment which substantially limits one or more . . . major life activities." W. Va. Code § 5-11-3(m)(1). "The term 'major life activities' includes functions such as caring for one's self, performing manual tasks, walking, hearing, speaking, breathing, learning and working[.]" *Id.*

"Once the plaintiff makes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the negative action taken against the complainant. The complainant then must prove that the employer's reason was pretextual." *Woods*, 214 W. Va. at 320, 824 S.E.2d at 547 (internal quotations and citations omitted). "To demonstrate pretext, a plaintiff must demonstrate that 'the employer did not act as it did because of its offered explanation.'" *Id.* (quoting *Skaggs v. Elk Run Coal Co.*, 198 W. Va. 51, 74, 479 S.E.2d 561, 584 (1996)).

Similar to Ms. Coffman's disability discrimination claim, to succeed on a reasonable accommodation claim under the WVHRA, she must prove the following elements:

> (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

*Burns v. West Virginia Dep't of Education and Arts*, 242 W. Va. 392, 398-99, 836 S.E.2d 43, 49-50 (2019) (quoting Syl. Pt. 2, *Skaggs*, 198 W. Va. at 51, 479 S.E.2d at 561).

Nexstar asserts Ms. Coffman is unable to satisfy the "qualified individual with a disability" element of both her disability discrimination and reasonable accommodation claims. It

9

asserts she was unable to work or perform the essential functions of her Account Executive position, with or without a reasonable accommodation, when she was terminated on August 19, 2022. Nexstar emphasizes Ms. Coffman remained on short-term disability at discharge, conclusively proving she was unable to work. [*See* ECF 26-3, Bush Depo. at 8:23-9:2 ("[H]er [short-term disability] was approved through, I think, the end of the summer, which means disabled, unable to work is how you qualify for it[.]")].

Nexstar further asserts Ms. Coffman failed to provide it with a definitive return-to-work date; thus, at termination, Nexstar knew only Ms. Coffman (1) remained under intense care, (2) was undergoing another surgery on August 8 requiring four to eight weeks of recovery, and (3) had a tentative surgery in October. [*See* ECF 28-4]. Nexstar contends she is unable "to point to any record evidence that it knew anything other than that she was not able to perform the essential duties of her job at the time of termination" and is, as a result, unable to establish "she was a 'qualified person with a disability' under the WVHRA." [ECF 27 at 12].

Reduced to its essence, Nexstar contends Ms. Coffman's inability to work precludes her being defined as a "qualified person with a disability." The position, at least with respect to an unpaid leave of absence, has been rejected by the Supreme Court of Appeals. In *Haynes*, the Court held "that a 'qualified disabled person' who is protected by the [WVHRA] . . . and regulations issued pursuant thereto, includes a person who has a disability and is temporarily unable to perform the requirements of the person's job due to their disability, with or without accommodation." 206 W. Va. at 31, 521 S.E.2d at 344; *see also Kitchen*, 552 F. Supp. 2d at 595-96 (explaining the "tricky or oxymoronic anomaly" presented respecting medical leave of absences in reasonable accommodation and disability discrimination claims under both the WVHRA and the Americans with Disabilities Act ("ADA")).

10

The Supreme Court of Appeals explained that to hold otherwise would disqualify a medical leave of absence from constituting a reasonable accommodation. *Id.* The West Virginia Court thus held a "reasonable accommodation" under the WVHRA "may include a temporary leave of absence that does not impose an undue hardship upon an employer, for the purpose of recovery from or improvement of the disabling condition that gives rise to an employee's temporary inability to perform the requirements of his or her job." *Id.* Ms. Coffman raises an extended medical leave of absence as one possible reasonable accommodation Nexstar could have offered her instead of termination. The Court rejects Nexstar's contention.

Indeed, Ms. Coffman asserts there were at least three reasonable accommodations that would have permitted her to perform her Account Executive position: (1) unpaid leave until she recovered; (2) remote work; or (3) paid parental leave commencing at the expiration of her short-term disability on August 24, 2022. Nexstar disagrees and further contends Ms. Coffman's failure to specifically request any one of these accommodations at termination dooms her claim. This argument is also misplaced. *See Alley v. Charleston Area Medical Center, Inc.*, 216 W. Va. 63, 75, n. 7, 602 S.E.2d 506, 518, n.7 (2004) (rejecting defendant's contention "that the trial court erred by instructing the jury that a medical leave of absence was not an appropriate form of accommodation because the plaintiff offered no evidence that she requested additional medical leave" inasmuch as "an employee is not required to prove that a specific alternative was available or requested, but rather whether some accommodation was possible.").

### 1. Extended Leave of Absence

First, Nexstar contends an additional period of unpaid leave was unreasonable and created an undue burden. It notes Ms. Coffman (1) provided no fixed return to work date in her August 4, 2022, email, and (2) she had then been absent for six months; Nexstar additionally asserts it was unable to transfer her accounts so long as she was on job-protected leave, creating a financial

strain on the company. Nexstar further asserts Ms. Coffman "cannot point to any evidence to dispute Nexstar could not tolerate her absence indefinitely—her accounts and leads needed to be shifted to other Account Executives because she was unable to return to work." [ECF 27 at 13]. Nexstar was thus left, it asserts, with no option but termination.

Ms. Coffman appears to contend she would have returned on September 19, 2022, the date she was cleared to return to work. [*See* ECF 28 at 4]. But that clearance came roughly a month after her termination. And Ms. Coffman's August 4, 2022, email gave not a hint she might soon be cleared. [*See* ECF 28-4]. The email instead explained (1) she "was still under intense care," (2) she had surgery on August 8, 2022, to remove her nephrostomy tube (requiring four to eight weeks of recovery time), (3) she had a tentative surgery in October, and (4) she would have a catheter preventing her from lifting and driving from August through October. [*Id.*]. Nexstar is not an oracle. And West Virginia law does not require it to attain that impossible status.[4]

It is true that, "in some instances[,] additional medical leave may be a reasonable accommodation[,]" but "it is only reasonable where it is finite and will be reasonably likely to enable the employee to return to work." *Kitchen*, 552 F. Supp. 2d at 595 (internal quotations omitted); *see also Halpern v. Wake Forest University Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (recognizing an employer is not required "to give a disabled employee an indefinite period of time to correct a disabling condition that renders him unqualified."); *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) ("We therefore hold that reasonable accommodation does not require the [defendant] to wait indefinitely for [plaintiff's] medical condition to be corrected. . . "); *Haynes*, 206 W. Va. at

---

[4]Ms. Coffman unavailingly adds that "[i]f Nexstar would have engaged in the legally required interactive process to determine a reasonable accommodation, it would have learned that [she] was fully cleared to return to work by her physician on September 19, 2022," [ECF 28 at 3]. The record demonstrates beyond any doubt Nexstar was fully engaged in regularly checking her status during her extended absence.

31, n.17, 521 S.E.2d at 344, n.17 (explaining "by disabling condition, we refer to a totally disabling medical condition of limited duration, so that following a temporary leave of absence for treatment and improvement, it is *reasonably foreseeable* that the plaintiff is likely to be able to return to work.") (emphasis added).[5] Inasmuch as Ms. Coffman's August 4, 2022, email failed to provide Nexstar with a definitive date upon which she could reasonably be expected to return to work, the Court concludes any additional period of unpaid leave -- especially after an additional three months of leave had already been provided -- would not have been a reasonable accommodation permitting Ms. Coffman to perform her essential job functions.

**2. Remote Work**

Nexstar next contends remote work was not a reasonable accommodation. It notes Ms. Coffman never requested remote work at termination. Neither did the record suggest she was able to perform work at that time. Assuming such a request, Nexstar insists she could not perform an essential function of her position, namely, the development of new, local direct business.[6] It notes

---

[5]The Court notes that our Court of Appeals' decisions in *Halpern* and *Myers* both dealt with claims asserted under the ADA as opposed to the WVHRA. Nonetheless, "the rights under the ADA and the WVHRA are coextensive, and authorities analyzing reasonable accommodation under the ADA are, therefore, instructive." *Burns*, 242 W. Va. at 398, n.7, 836 S.E.2d at 49, n.7.

[6]Nexstar's General Manager Al Sandubrae explained the concept of developing new local direct business as follows:

> Account [E]xecutives go out and consult with businesses in terms of how we can help grow their business. They're quantified as a new local direct account if they don't have an advertising agency, because advertising agencies get involved in the commission rates and everything else. So new local direct is pure new local business. Each [A]ccount [E]xecutive and me, as a station, has a budget in terms of the amount of new local direct revenue that's to be generated over the course of that year. When you don't have that being achieved by an [A]ccount [E]xecutive, then two things happen. Number one, we start getting off on budget. Number two, the other [A]ccount [E]xecutives are encouraged to try and make up the deficit that this other [A]ccount [E]xecutive is not making. That wasn't and isn't specific to [Ms. Coffman]. At any given point in time over the years, if you have a deficit, we've got to make it up. And so that deficit, if you will, is divvied up appropriately between the [A]ccount

travel and in-person meetings, are critical for her position, although it removed the obligation while she was on bedrest. [ECF 27 at 15].

While Ms. Coffman need not prove she requested a specific accommodation, she must prove one was possible at the relevant point. *Alley*, 216 W. Va. at 75, n. 7, 602 S.E.2d at 518, n.7. And she has failed to demonstrate that, at the time of her August 2022 termination, she was able to work at all, whether in person or remotely.

Again, the August 4, 2022, email does not reasonably demonstrate she was in any condition to work from home at termination. She "was still under intense care," was undergoing surgery four days later that would require four to eight weeks of recovery, and had a tentative surgery in October. Additionally, as late as June 2022, Ms. Coffman told Ms. Patrick her short-term disability was being extended as she could not return due to the remaining nephrostomy tube. [ECF 26-16 at 3]. Ms. Coffman's follow-up text message thereafter stated "[p]lease do not contact me regarding a return to work date when I have been classified as unable to return and still have short[-]term disability plus bonding leave." [*Id.*].

Ms. Coffman's June and August communications indicate an inability and unwillingness to work anywhere. And while she previously worked remotely while on bedrest and during the Pandemic, there is no indication she was incapable of working at these times. Her situation and condition at termination were much different according to her own self appraisal and her continuing receipt of short-term disability benefits.

---

[E]xecutives so that at the end of the year, we hit our budget numbers. So that's what new local is.

[ECF 26-4, Sandubrae Depo. at 73:2-22].

Based upon the foregoing, remote work was not a reasonable accommodation at termination.

### 3. Paid Parental Leave

Ms. Coffman next points to the thirty-day period of paid leave from -- August 19, 2022, until September 19, 2022 -- available to her under Nexstar's paid parental leave policy. This contention, however, runs into the same difficulty as earlier noted. It would have required Nexstar to divine -- out of thin air -- her clearance to return to work.

Nexstar notes Ms. Coffman mischaracterizes the paid parental leave policy in any event. It claims "[t]o be eligible for the paid paternal leave benefit, an employee must be eligible for FMLA and must have exhausted any entitlement to short-term disability benefits." [*Id.*]. The policy "was implemented to cover the gap in the typical FMLA leave for employees after childbirth—which typically results in entitlement to [six] weeks of short-term disability pay or [twelve] weeks of short-term disability pay for a complicated birth" and "was never intended that any employee would be entitled to more than [thirty-two] weeks of job-protected leave" given it is "unable to hold positions open for that long." [*Id.*].

The description ties with testimony from Nexstar's Senior Vice President of Human Resources, Terri Bush:

> Q. What benefits were available to Ms. Coffman after the birth of her twins?
>
> A. Well, we had -- we instituted a paid parental leave program in January 2022, but first you go -- if you're the birth parent, you go on -- you have your birth event and you presumably are declared disabled for a certain portion of that, I guess. What I've always been told is that they'll approve you for six weeks for the delivery and up to twelve if it's complicated, like a C section or something, but most people are declared disabled for six weeks, at least half of the FMLA period . . . So those are the benefits that would have been available, Nexstar paid parental leave, short-term disability. After short-term disability is over, then we could do paid parental leave.
>
> Q. So after short-term disability, then you get paid parental leave?

A. Right. If you're – yeah. We make the participants exhaust their short-term disability benefits before the paid parental leave. They can't be double paid, so . . .

Q. Okay. How long can someone be on short-term disability?

A. Well, as long as their doctor says they're disabled, up to the maximum of 26 weeks. But that's different from how long . . . they [can] stay on [a] leave of absence.

Q. Okay. So she could have been on short-term disability for 26 weeks, correct?

A. Correct. If it were approved for that length of time, yes.

. . . .

Q. Okay. And then after that is exhausted, you then can go on paid parental leave?

A. If you --- well, no, because your employment probably would be terminated by that point.

Q. Why is that? Why couldn't you go on paid parental leave?

A. Because we can't hold spots open that long. It's unduly burdensome.

[ECF 26-3, Bush Depo. at 13:20-14:11, 15:3-12]. Ms. Bush further explained as follows:

Q. How long is this paid parental leave for, six weeks?

A. It's six weeks.

Q. Six or twelve?

A. It's six, but it's concurrent with your FMLA, your job-protected leave. To be eligible for the program, you have to be eligible for FMLA, so it runs concurrent with that.

Q. Okay. But it runs after the short-term disability?

A. Correct. So in a traditional, ordinary sense, if you had a 12-week FMLA approved leave, then you would go out, you would have two weeks of unpaid. We'd let you use sick or vacation time to fill that gap, then your short-term disability benefits would kick in for the remaining ten weeks of your leave and then we would allow you to have six weeks fully paid after your FMLA expired.

> Q. Okay. Was Ms. Coffman on short-term disability leave?
>
> A. She was receiving short-term disability benefits. She was on Family Medical Leave Act leave.
>
> Q. Okay. And was that set to expire on August 24, 2022?
>
> A. No. Her FMLA leave expired in mid-May 2022.
>
> Q. I'm talking about her short-term disability.
>
> A. I don't know. It's like two trains on separate tracks parallel. FMLA runs out; the [short-term disability] train keeps on going.
>
> Q. Okay. And was she ever on paid parental leave?
>
> A. No, not to my knowledge. She wouldn't have achieved it because she never returned from disability, from receiving disability benefits.

[*Id.* at 15:22-17:8].

Ms. Coffman does not counter this description. And it is incumbent upon her to show the six weeks of paid parental leave would be available to an employee who had exhausted twelve weeks of FMLA leave, in addition to twenty-six weeks of short-term disability. It instead appears Nexstar's policy accounts for an eighteen-week leave maximum as opposed to that which Ms. Coffman claims she was entitled, namely, an additional six-weeks of leave after twenty-four weeks had been provided. No reasonable juror could conclude Nexstar's paid parental leave was a reasonable accommodation available at termination.

Ms. Coffman has consequently not made a prima facie case of disability discrimination or a failure to provide a reasonable accommodation.

C.  **FMLA: Retaliatory Discharge Claim**

"The FMLA prohibits employers from discriminating against an employee for exercising [her] FMLA rights." *Roberts v. Gestamp West Virginia, LLC*, 45 F.4th 726, 738 (4th Cir. 2022) (quoting *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019)). Similar to Ms. Coffman's

17

disability discrimination claim under the WVHRA, "the *McDonnell Douglas* burden-shifting framework [applies] to FMLA-retaliation claims." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). "To establish a prima facie case of FMLA retaliation, a plaintiff must demonstrate (1) [she] engaged in a protected activity; (2) [her] employer took an adverse employment action against [her]; and (3) there was a causal link between the two events." *Id.* (quoting *Hannah P.*, 916 F.3d at 347 (cleaned up)). "If the plaintiff succeeds on this front, 'the burden shifts to the defendant to provide a legitimate, nonretaliatory reason for taking the employment action at issue.'" *Id.* If the defendant provides such a reason, "the plaintiff may still prevail if [she] can show pretext." *Id.*

The first two elements are not in dispute. But, as Nexstar notes, the causal link is troublesome for Ms. Coffman. It is difficult to imagine a link -- even a tenuous one -- between termination and her FMLA leave given Nexstar provided her with FMLA leave "when she wanted to take it—and extended the job-protected leave to more than twice the amount of time required by the FMLA." [ECF 30 at 3-4]. There is, however, Ms. Coffman's contention about Mr. Large's January 2022 statement during her hospitalization that Nexstar was "trying to keep [her] off FMLA" at that time so she could continue working remotely and retain access to her accounts. As a matter of law, however, that statement is a slender reed upon which to hang a jury question on retaliation.

That is so for multiple reasons, not the least of which is Ms. Coffman's concession she did not want to take FMLA leave during this time inasmuch as "it was still early in the pregnancy;" [ECF 26-7, Coffman Depo. at 49:6-50:7] staying off FMLA leave was to her benefit, inasmuch as working remotely while on bedrest allowed her to retain eligibility for FMLA leave until after her twins were born. [*Id.*] Respecting other reasons, (1) Ms. Coffman conceded Ms. Patrick had provided her with FMLA leave paperwork prior to the birth of her twins [*Id.* at 49:9-13]; and (2) Ms. Patrick testified Ms. Coffman became "upset" at that event as she did not want to go on

18

FMLA leave during her hospitalization; [ECF 26-9, Patrick Depo. at 19:15-21:12]. Ms. Coffman cannot reasonably characterize Mr. Large's statement as indictive of some ill intent; the record demonstrates Nexstar permitted Ms. Coffman to take FMLA leave when she wanted and without issue. Indeed, Nexstar gave her an additional twelve weeks of leave after her guaranteed initial twelve weeks of FMLA leave expired in May 2022.

There is absent the required causal link between Ms. Coffman's termination and her taking of FMLA leave.[7]

### D. WVHRA: Retaliatory Discharge Claim

To succeed on a retaliatory discharge claim under the WVHRA, a plaintiff must prove the following elements: (1) she "engaged in protected activity;" (2) her "employer was aware of the protected activities;" (3) she "was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation);" (4) her "discharge followed . . . her protected activities within such period of time that the court can infer retaliatory motivation." *Roth v. DeFeliceCare, Inc.*, 226 W. Va. 214, 224, 700 S.E.2d. 183, 193 (2010) (quoting Syl. Pt. 10, *Hanlon v. Chambers*, 195 W. Va. 99 464 S.E.2d 741(1995)); *see also* Syl. Pt. 4, *Frank's Shoe Store v. West Virginia Human Rights Commission*, 179 W. Va. 53, 365 S.E.2d 251 (1986); Syl. Pt. 1, *Brammer v. Human Rights Commission*, 183 W. Va. 108, 394 S.E.2d 340 (1990)).

A "protected activity" under the WVHRA "includes opposition to a practice that the plaintiff reasonably and in good faith believes violates the provisions of the [WVHRA]." *Id.* (citing Syl. Pt. 7, *Conrad v. ARA Szabo*, 198 W. Va. 362, 480 S.E.2d 801 (1996)). Indeed, the relevant provision of the WVHRA makes it unlawful for an employee to

> [e]ngage in any form of reprisal or otherwise discriminate against any person *because he or she has opposed any practices or acts forbidden under this article* or because

---

[7]To the extent Ms. Coffman's WVHRA retaliatory discharge claim is premised on exercising her FMLA leave, the claim fails for this same reason.

he or she has filed a complaint, testified or assisted in any proceeding under this article.

W. Va. Code § 5-11-9(7)(C) (emphasis added). Further, retaliation claims under the WVHRA are subject to the same burden-shifting framework previously mentioned. *Colgan Air, Inc. v. West Virginia Human Rights Commission*, 221 W. Va. 588, 597, 656 S.E.2d. 33, 42 (2007). Once a plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for her discharge. *Id.* If the defendant satisfies its burden, the plaintiff must then adduce evidence that the reasons offered by the defendant are pretextual. *Id.*

Nexstar contends Ms. Coffman "did not engage in any protected activity." [ECF 27 at 17]. Ms. Coffman responds "[b]y asking for a reasonable accommodation of working from home" and "pursuing her . . . short-term disability rights," she was "clearly" engaged in protective activity. [ECF 28 at 12]. She asserts "[t]o hold otherwise would allow a corporate defendant to retaliate and fire any employee who sought a reasonable accommodation." [*Id.* at 12]. Assuming a request for a reasonable accommodation constitutes engaging in a "protected activity," as explained in detail above, Ms. Coffman has failed to demonstrate any of her proffered accommodations, including remote work, were reasonable at termination. Accordingly, the Court concludes her retaliatory discharge claim fails as a matter of law.

### III.

Based on the foregoing discussion, Nexstar's Motion for Summary Judgment [**ECF 26**] is **GRANTED**.

The Clerk is directed to send copies of this written opinion and order to counsel of record and any unrepresented party.

ENTER: November 7, 2023



Frank W. Volk
United States District Judge